UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

SAMUEL CABASSA,

                              Plaintiff,

        v.                                                9:01-CV-1039
                                                          (DNH/GHL)
HANS WALKER, Superintendent, Auburn C.F.;
D.W. SEITZ, Correctional Officer, Auburn C.F.;
CRAIG GUMMERSON, Captain, Auburn C.F.,

                              Defendants.

_____

APPEARANCES:                                   OF COUNSEL:

SAMUEL CABASSA, 84-A-0364
  Plaintiff, *Pro Se*
Upstate Correctional Facility
P.O. Box 2001
Malone, New York 12953

HON. ANDREW M. CUOMO                           DAVID L. FRUCHTER, ESQ.
Attorney General for the State of New York     Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

GEORGE H. LOWE, United States Magistrate Judge

## **REPORT-RECOMMENDATION**

        This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Generally, in his

Fourth Amended Complaint, Samuel Cabassa ("Plaintiff") alleges that fifteen employees of the

New York State Department of Correctional Services ("DOCS") violated his rights under the

First, Eighth and Fourteenth Amendments between January of 1998 and August of 1998 by

confining him to the Auburn Correctional Facility ("Auburn C.F.") Special Housing Unit

("S.H.U.") without cause or explanation, and by being deliberately indifferent to his serious

medical needs, which included severe dehydration during his hunger strike, a painful eye

condition, a painful hemorrhoid condition and a deteriorating mental health condition.  (*See*

*generally* Dkt. No. 16 [Plf.'s Fourth Am. Compl.].)

On January 28, 2005, Defendants filed their *first* motion for summary judgment.  (Dkt.

No. 58.)  By Order filed June 1, 2006, Judge Hurd granted in part, and denied in part, that

motion, dismissing all of Plaintiff's claims except two groups of claims: (1) his Fourteenth

Amendment claims against Auburn C.F. Superintendent Hans Walker and Correctional Officer

D.W. Seitz (asserted in his Fourth Cause of Action); and (2) his First and Fourteenth Amendment

claims against Walker, Seitz and Auburn C.F. Captain Craig Gummerson (asserted in his Fifth

Cause of Action).  (Dkt. No. 68.)

Currently before the Court is Defendants' *second* motion for summary judgment.  (Dkt.

No. 81.)[1]  For the reasons that follow, I recommend that Defendants' motion be granted in part

and denied in part.

## I.      APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of

---

[1]      By Order filed March 30, 2006, I granted Defendants leave to file a second motion
for summary judgment.  (Dkt. No. 62.)

material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[3]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[4]  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[5]  Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[6]

Where a non-movant fails to adequately oppose a properly supported factual assertion made in a motion for summary judgment, a district court has no duty to perform an independent

---

[2]       A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[3]       *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) [citation omitted]; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) [citation omitted].

[4]       Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

[5]       Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading . . . ."); *Matsushita*, 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[6]       *Ross v. McGinnis*, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) [internal quotations omitted; emphasis added].

review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se*.[7]  In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[8]  (Here, I note that Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[9]  In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[10]  An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[11]  Finally, even where an

---

[7]      *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord*, *Lee v. Alfonso*, No. 04-1921, 2004 U.S. App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak*, 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell*, 289 F. Supp.2d 289, 295 (N.D.N.Y. Oct. 29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan*, 253 F. Supp.2d 369, 371-372 (N.D.N.Y. 2003) (Hurd, J.).

[8]      *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

[9]      (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)

[10]      *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.*, 425 F.2d 92, 97 (2d Cir. 1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

[11]      *See, e.g.*, *Bickerstaff v. Vassar Oil*, 196 F.3d 435, 452 (2d Cir. 1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition

affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[12]

testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places. . . .  It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e]), *cert. denied*, 474 U.S. 829 (1985); *Applegate*, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

[12]     *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner*, 03-CV-3789, 2006 WL 357824, at *3-4 & n.7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.*, 332 F. Supp.2d 599, 612 (S.D.N.Y. 2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd*, 136 F. App'x 383 (2d Cir. 2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

It bears noting that Plaintiff is an experienced litigant.  For example, before he filed his original Complaint in this action on June 25, 2001, he had litigated at least a half dozen civil actions in state or federal courts, challenging the conditions of his confinement.[13]  In one of those actions, he was awarded $1,000 following a jury trial.[14]  (He has also litigated numerous civil actions in state or federal courts since the filing of this action.)  However, after carefully reviewing Plaintiff's litigation experience, I have concluded that his experience is not so extensive as to warrant a recommendation that the Court revoke the special solicitude normally afforded *pro se* litigants due to their inexperience.[15]

---

[13]      *See, e.g., Cabassa v. Kuhlmann*, 569 N.Y.S.2d 824 (N.Y.S. App. Div., 3d Dept., 1991) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied*, 78 N.Y.2d 858 (N.Y. 1991); *Cabassa v. Coughlin*, 92-CV-6199 (W.D.N.Y. filed May 11, 1992) (personal injury action against prison officials); *Cabassa v. Wende Corr. Fac.*, Index No. 001846/1995 (N.Y.S. Sup. Ct., Erie County, filed March 14, 1995) (Article 78 proceeding to review prison disciplinary conviction); *Cabassa v. Rufat*, 96-CV-6280 (W.D.N.Y. filed June 20, 1996) (prisoner civil rights action); *Cabassa v. Goord*, 720 N.Y.2d 76 (N.Y.S. App. Div., 4th Dept., Feb. 7, 2001) (Article 78 proceeding to review prison disciplinary conviction), *leave to appeal denied*, 96 N.Y.2d 713 (N.Y., June 5, 2001).

[14]      *See Cabassa v. Rufat*, 96-CV-6280, Judgment (W.D.N.Y. filed Sept. 9, 1999) (judgment for Plaintiff in amount of $1.00 in compensatory damages, and $1,000 in punitive damages, following jury trial in prisoner civil rights action).

[15]      "There are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special [liberality or] solicitude" that is normally afforded *pro se* litigants." *Koehl v. Greene*, 06-CV-0478, 2007 WL 2846905, at *3 & n.17 (N.D.N.Y. Sept. 26, 2007) (Kahn, J., adopting Report-Recommendation) [citations omitted], *accord*, *Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001) (unpublished opinion), *aff'g*, 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting*, Report-Recommendation, at 1, n.1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson*, 201 F.3d 431, at *2 (2d Cir. 1999) (unpublished opinion), *aff'g*, 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting*, Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir. 1994); *see also Raitport v. Chem. Bank*, 74 F.R.D. 128, 133 (S.D.N.Y. 1977) [citing *Ackert v. Bryan*, No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring).

II.     **ANALYSIS**

A.     **Plaintiff's Fourth Cause of Action**

Construed with the *extra* degree of leniency with which *pro se* civil rights claims are

generally afforded,[16] Plaintiff's Fourth Cause of Action alleges as follows: between **January 12,**

**1998**, and **June 22, 1998**, while Plaintiff was incarcerated at Auburn C.F., **Defendant Hans**

**Walker** (the superintendent of Auburn C.F.) and **Defendant D.W. Seitz** (a lieutenant at Auburn

C.F.) violated Plaintiff's rights under the Due Process Clause of the **Fourteenth Amendment** in

the following three (related) ways: (1) they "fail[ed] to provide [a] meaningful review of his

[original assignment to Administrative Segregation]," which occurred on January 12, 1998; (2)

they "never re-visit[ed] the propriety [of] or [made] any meaningful determination as to the

legitimacy of[,] the need for his continued confinement [in Administration Segregation]," even

though "no new evidence was used to justify his ongoing confinement"; and (3) they intentionally

"retain[ed] him in [Administrative Segregation]" for 161 days (i.e., from January 12, 1998, to

June 22, 1998) "by perfunctor[ily] rubber-stamping . . . [Administrative Segregation] review

forms.  (Dkt. No. 16, ¶¶ 3[c], 3[h], 6[18], 7 & "Fourth Cause of Action" [Plf.'s Fourth Am.

Compl.].)

Defendants argue that Plaintiff's Fourth Cause of Action should be dismissed because the

vast majority (if not the entirety) of that claim is based on events that occurred *before* June 20,

---

[16]     Of course, a liberal construction must be afforded to *all* pleadings (whether
brought by *pro se* litigants or not), under Fed. R. Civ. P. 8.  *See* Fed. R. Civ. P. 8(f) ("All
pleadings shall be so construed as to do substantial justice.").  However, an *extra* liberal
construction must be afforded to the pleadings of *pro se* plaintiffs (especially those asserting civil
rights claims).  *See Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) ("[C]ourts must construe
*pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.")
[internal quotation marks and citation omitted]; *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

1998, and thus are outside the three-year limitations period governing Plaintiff's claims (which were deemed filed, along with his original Complaint, on June 20, 2001). (Dkt. No. 81, Part 5, at 5 [Defs.' Memo. of Law].) Defendants argue further that, even if Plaintiff's Fourth Cause of Action were not barred by the applicable statute of limitations, that cause of action would fail as a matter of law because Plaintiff's confinement at Auburn C.F. between January 12, 1998, and June 22, 1998 (which consisted of a total of 60 days' confinement in the S.H.U. and 101 days' confinement in Auburn C.F. Infirmary because of his "hunger strike") did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment. (*Id*. at 4-8.)

Plaintiff responds to Defendants' position regarding his Fourth Cause of Action with two arguments. First, Plaintiff argues that the statute of limitations does not bar his claim to the extent the claim is based on events occurring before June 20, 1998, because those events were part of a "continuing violation," and thus his claim is exempt from the applicable statute of limitations. (Dkt. No. 85, Part 3, at 6-8.) Second, Plaintiff argues that his confinement at Auburn C.F. between January 12, 1998, and June 22, 1998, did indeed present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a due process claim under the Fourteenth Amendment because (1) even when Plaintiff was in the Auburn C.F. Infirmary, he was in a part reserved for prisoners confined to S.H.U., and (2) the conditions of confinement (in S.H.U. and the Infirmary) were so harsh that they were atypical of those normally experienced in either the general populations of, or infirmaries in, correctional facilities in New York State. (*Id*. at 8-10; *see also* Dkt. No. 85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response].)

8

Defendants reply to Plaintiff's response regarding his Fourth Cause of Action with two arguments.  First, Defendants argue that Plaintiff cannot avail himself of the continuing-violation doctrine because (1) the acts that occurred outside of the statutory period were not sufficiently connected to the acts that occurred within the statutory period, and (2) Plaintiff has not shown the sort of compelling circumstances necessary to permit the application of the continuing-violation doctrine in the Second Circuit.  (Dkt. No. 88, Part 1, at 1-2.)  Second, Defendants argue that whether or not Plaintiff's residence in the Auburn C.F. Infirmary was particularly restrictive is of no consequence since (1) it is to be expected that inmates housed in prison hospital will not be able to move around, or engage in activities, as much as inmates housed in the general population, and (2) Plaintiff was placed in the Infirmary due to the "hunger strike" that he chose to undertake.  (*Id*. at 4-5.)

## 1.    Continuing Violation Doctrine

For the sake of argument (and because Defendants do not argue that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983),[17] I will assume, for purposes of this Report-Recommendation, that the continuing-violation doctrine *does* apply to actions filed pursuant to 42 U.S.C. § 1983.[18]  The first issue presented by the parties'

---

[17]     (*See* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law, not arguing that the continuing-violation doctrine does *not* apply to actions filed pursuant to 42 U.S.C. § 1983], *accord*, Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law], Dkt. No. 66, Part 1 [Defs.' Objections to Judge Lowe's Report-Recommendation Regarding Defs.' *First* Motion for Summary Judgment].)

[18]     *Compare Pino v. Ryan*, 49 F.3d 51, 54 (2d Cir. 1995) (finding inmate's deliberate indifference claims under Section 1983 to be time-barred where inmate had "alleged no facts indicating a continuous or ongoing violation of his constitutional rights"), *aff'g*, *Pino v. Ryan*, 94-CV-0221, Order of Dismissal (N.D.N.Y. March 30, 2004) (Scullin, J.), *with McFarlan v. Coughlin*, 97-CV-0740, 1998 U.S. Dist. LEXIS 5541, at *11 (N.D.N.Y. March 13, 1998)

arguments with regard to the continuing-violation doctrine is whether the relevant acts of

Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between

January 12, 1998, and June 19, 1998) were *sufficiently connected* to the relevant acts of those

individuals that occurred within the statutory period (i.e., between June 20, 1998, and June 22,

1998).  The second issue presented by the parties' arguments is whether Plaintiff has shown

*compelling circumstances* to warrant the application of the continuing-violation doctrine.[19]

According to the undisputed record evidence, the relevant acts of Defendants Walker and

Seitz were as follows:

1.      On January 12, 1998, Defendant Seitz signed a written recommendation that

Plaintiff be placed in administrative segregation.  (*Compare* Dkt. No. 81, Part 2, ¶ 1 [Defs.' Rule

7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 1 [Plf.'s Rule 7.1 Response,

admitting fact in question].)  That recommendation was based on information provided by three

---

(Homer, M.J.) ("The applicability of the continuing violation doctrine to Section 1983 cases is
uncertain.") [collecting cases], *adopted by* 1998 U.S. Dist. LEXIS 5518, at *3 (N.D.N.Y. Apr.
15, 1998) (Pooler, J.) (agreeing with magistrate judge's "carefully-reasoned decision" regarding,
inter alia, the application of the continuing violation doctrine).

[19]     The requirement that *compelling circumstances* be shown to warrant the
application of the continuing-violation doctrine appears to be a different issue than whether the
acts that occurred outside of the relevant statutory period were *sufficiently connected* to the acts
that occurred within the statutory period.  *See Young v. Strack*, 05-CV-9764, 2007 WL 1575256,
at *4 (S.D.N.Y. May 29, 2007) (treating the requirement that *compelling circumstances* exist as
something distinct from the requirement that a sufficient connection exist between the acts in
question), *accord*, *McFadden v. Kralik*, 04-CV-8135, 2007 WL 924464, at *6-7 (S.D.N.Y.
March 28, 2007); *see also Blesdell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1415 (S.D.N.Y. 1989)
(stating that compelling circumstances are needed to warrant the application of the continuing-
violation doctrine, and that a sufficient connection between the acts in question is necessary to
warrant the application of the continuing-violation doctrine, but not stating that compelling
circumstances and sufficient connection are the same thing).

confidential informants (each an inmate) that Plaintiff had threatened them.  (*See* Dkt. No. 85, Part 4, at 15, 17 [Exs. A and B to Plf.'s Decl.].)

2.      On January 14 and 15, 1998, Defendant Seitz testified at Plaintiff's administrative segregation hearing.  (*See* Dkt. No. 81, Part 4, at 4-5 [Ex. B to Fruchter Decl., attaching Hearing Record Sheet].)  At the conclusion of the hearing on January 15, 1998, the hearing officer (Captain Gummerson) found that Plaintiff should be placed in administrative segregation to preserve the safety and security of inmates at Auburn C.F. (including the three inmates in question).  (*Compare* Dkt. No. 81, Part 2, ¶ 3 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 85, Part 4, at 16-17 [Ex. B to Plf.'s Decl.].)

3.      On or about January 30, 1998, Defendant Walker approved a review of Plaintiff's administrative segregation status that had been conducted by a three-member Periodic Review Committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), pursuant to DOCS Directive 4933.  (*See* Dkt. No. 85, Part 4, at 23 [Ex. E to Plf.'s Decl.].)[20]  Defendant Walker approved similar reviews on or about the following five dates: February 6, 1998; February 13, 1998; February 20, 1998; February 27, 1998; and March 6, 1998.  (*See* Dkt. No. 85, Part 4, at 24-28 [Ex. E to Plf.'s Decl.].)

4.      Plaintiff's fellow prisoner, Thomas O'Sullivan, swears that, in "late February or

---

[20]      Specifically, DOCS Directive 4933 required that Plaintiff's administrative segregation status be reviewed every seven (7) days for the first two months of his administrative segregation, and every thirty (30) days thereafter, by a three-member committee (consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff), and then (after he receives the committee's review results) by the superintendent.  (*See* Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)

11

early March [of] 1998," Corrections Counselor Robert Mitchell stated to Mr. O'Sullivan that, although he (Robert Mitchell) was a member of the three-member Periodic Review Committee at Auburn C.F., he had "no say in the matter [of assisting prisoners to be released from segregation], since "security makes all of the decisions.  They just send me papers periodically to sign.  There is no actual committee that meets."  (*See* Dkt. No. 85, Part 4, at 30 [Ex. F to Plf.'s Decl.].)[21]

5.      On or about March 28, 1998, Plaintiff filed an Article 78 petition in New York State Supreme Court, Cayuga County, challenging the January 15, 1998, Tier III disciplinary determination that placed him in administrative segregation.  (*Compare* Dkt. No. 81, Part 2, ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact in question]; *see also* Dkt. No. 81, Part 4, at 9 [Ex. D to Fruchter Affid., attaching final decision in the action, which states that Plaintiff's petition was verified on March 28, 1998], *accord*, Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

6.      On May 26, 1998, Acting Supreme Court Justice Peter E. Corning (of the New York State Supreme Court, Cayuga County) issued a decision ordering that "the [aforementioned] Tier III disciplinary determination be annulled, the petitioner be restored to the status he held prior to this determination, and that all references [to] this determination be expunged from his institutional record."  (*See* Dkt. No. 81, Part 2, ¶ 6 [Defs.' Rule 7.1 Statement,

---

[21]      Defendants argue that Inmate O'Sullivan's affidavit should not be considered by the Court on their second motion for summary judgment (1) because the evidence is inadmissible hearsay and (2) the events described in the affidavit are beyond the applicable limitations period. (Dkt. No. 88, Part 1, at 3-4 [Defs.' Reply Memo. of Law].)  I do not understand, or agree with, Defendants' second reason.  In any event, I will assume, for purposes of this Report-Recommendation, that Inmate O'Sullivan's affidavit is admissible because I do not believe it to alter the outcome of this Report-Recommendation.

essentially asserting fact in question]; Dkt. No. 85, Part 2, ¶ 6 [Plf.'s Rule 7.1 Response,

admitting fact asserted by Defendants]; Dkt. No. 85, Part 4, ¶ 14 [Plf.'s Decl., asserting fact in

question]; Dkt. No. 85, Part 4, at 37 [Ex. H to Plf.'s Decl., attaching decision in question].)

7.     While it is unclear from the record, it appears that no correctional officials at

Auburn C.F. became aware that Plaintiff had won his Article 78 proceeding until the morning of

June 19, 2001.  (Dkt. No. 85, Part 4, ¶ 15 [Plf.'s Decl., swearing that "[o]n June 19, 1998, early in

the morning C.O. Exner (SHU Staff) informed plaintiff that the 'A' Officer *had just received a*

*call* that the plaintiff won his Article 78 [proceeding] . . . ."] [emphasis added]; *see also* Dkt. No.

85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998,

from Assistant Attorney General Louis J. Tripoli to Plaintiff]; *cf.* Dkt. No. 85, Part 4, at 39, 43

[Ex. I to Plf.'s Decl., attaching letters dated June 22, 1998, from Plaintiff to Judge Corning and

Assistant Attorney General Louis J. Tripoli, stating that *Plaintiff* was first told of decision on

morning of June 19, 1998].)

8.     On the evening of June 20, 1998, at approximately 7:40 p.m., Plaintiff asked

Defendant Seitz when Plaintiff was going to be returned from S.H.U. to the prison's general

population (pursuant to the May 26, 1998, decision of Acting Supreme Court Justice Peter E.

Corning); and Defendant Seitz responded that Plaintiff was not going back into the general

population because "Auburn's Administration runs the prison, not the Judge."  (*See* Dkt. No. 85,

Part 4, ¶ 17 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s Decl., stating approximate

time of conversation]; Dkt. No. 16, ¶ 6[15] [Plf.'s Verified Fourth Am. Compl.].)

9.     On the afternoon of June 22, 1998, Plaintiff was released from S.H.U. and

returned to the facility's general population.  (*Compare* Dkt. No. 81, Part 2, ¶ 7 [Defs.' Rule 7.1

Statement, asserting fact in question] *with* Dkt. No. 85, Part 2, ¶ 7 [Plf.'s Rule 7.1 Response,

admitting fact in question]; *see also* Dkt. No. 85, Part 4, ¶ 21 [Plf.'s Decl.]; Dkt. No. 16, ¶ 6[17]

[Plf.'s Verified Fourth Am. Compl.].)

Liberally construed, Plaintiff's argument in support of the application of the continuing-

violation doctrine is that Defendant Seitz's malicious statement on June 20, 1998 (regarding

which Plaintiff filed a timely claim in this action), was yet another manifestation of a conspiracy

between Defendants Seitz and Walker (and others) to wrongfully confine Plaintiff in the Auburn

C.F. S.H.U., which stretched back to Defendant Walker's "rubber-stamping" of the results of the

Periodic Review Committee's review of Plaintiff's administrative segregation status (on January

30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and

March 6, 1998), and even to Defendant Seitz's issuance of the written recommendation that

Plaintiff be placed in administrative segregation on January 12, 1998.  (Dkt. No. 85, Part 3, at 6-

8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 5-21 [Plf.'s Decl.].)[22]

For the sake of argument, I will set aside the fact that I have found no reason to believe

that any of the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above,

violated any provision of the Constitution.  A prisoner enjoys no constitutional right against

being issued an administrative segregation recommendation that turns out to be false.[23]

---

[22]    I note that Plaintiff does not allege or assert, nor does any record evidence
suggest, that Defendant Walker played any role during Plaintiff's appeal from the hearing
decision in question (issued by Captain Craig Gummerson); rather, Plaintiff took that appeal
directly to the Director of the Special Housing/Inmate Disciplinary Program at DOCS, Donald
Selsky.  (*See* Dkt. No. 16, ¶¶ 6[5]-6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4,
¶¶ 6, 13 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 17, 32 [Exs. B and G to Plf.'s Decl.].)

[23]    *See Ciaprazi v. Goord*, 02-CV-0915, 2005 WL 3531464, at *13 (N.D.N.Y. Dec.
22, 2005) (Sharpe, J.; Peebles, M.J.) ("It is well established that in the absence of other

Moreover, even if Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the Periodic Review Committee's review of Plaintiff's administrative segregation status, a violation of a DOCS Directive is not a violation of the Constitution, or of 42 U.S.C. § 1983.[24]  The reason that I set these facts aside is that I can find no record evidence that there was any connection whatsoever between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's malicious statement on June 20, 1998.

For example, there is no record evidence that Defendant Seitz issued his written recommendation of January 12, 1998, maliciously, that is, *knowing* it to be based on information that was false.  Judge Corning's decision of May 26, 1998, certainly did not so find.  Rather, Judge Corning merely found error in the decision of the officer presiding over Plaintiff's administrative segregation hearing (Captain Gummerson) not to make an independent inquiry into the reliability or credibility of the confidential information provided by three of Plaintiff's fellow inmates, which formed the basis of the recommendation that Plaintiff be placed in

---

aggravating factors, an inmate enjoys no constitutional right against the issuance of a false misbehavior report.") [citations omitted]; *Hodges v. Jones*, 873 F. Supp. 737, 743-44 (N.D.N.Y. 1995) (Chin, J., sitting by designation) ("A prison inmate does not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in deprivation of a protected liberty interest.") [internal quotation marks and citation omitted].

[24]      A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.  *See Doe v. Conn. Dept. of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") [internal quotation marks and citation omitted].  Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation (much less a violation of 42 U.S.C. § 1983).  *See Rivera v. Wohlrab*, 232 F. Supp.2d 117, 123 (S.D.N.Y. 2002) [citation omitted]; *Lopez v. Reynolds*, 998 F. Supp. 252, 259 (W.D.N.Y. 1997).  This is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.  *See Farinaro v. Coughlin*, 642 F. Supp. 276, 280 (S.D.N.Y. 1986).

15

administrative segregation.  (*See* Dkt. No. 85, Part 4, at 36-37 [Ex. H to Plf.'s Decl.].)[25]

Similarly, there is no record evidence that Defendant Seitz gave *false* testimony at

Plaintiff's administrative segregation hearing on January 14 and 15, 1998, for example, by falsely

stating that he had knowledge of the credibility of the three confidential informants at issue.  To

the contrary, Judge Corning found that Defendant Seitz acknowledged at the hearing that he had

based his recommendation solely on their reports.  (*Id.*)[26]

Furthermore, there is no record evidence that Defendant Seitz was a member of the

aforementioned three-member Periodic Review Committee that (allegedly) shirked its duty,

under DOCS Directive 4933, to adequately review Plaintiff's administrative segregation status.

(*See* Dkt. No. 85, Part 4, at 23-38 [Ex. E to Plf.'s Decl., not indicating the signature of Def. Seitz

on any of the relevant forms]; Dkt. No. 16, ¶ 6[18] [Plf.'s Verified Fourth Am. Compl., asserting

that the Periodic Review Committee was made up of individuals other than Def. Seitz].)  Nor is

---

[25]     Judge Corning expressly rejected Plaintiff's allegation that the hearing officer was
not fair and impartial, and had committed other procedural errors.  (*See* Dkt. No. 85, Part 4, at
36-37 [Ex. H to Plf.'s Decl.].)

[26]     It bears noting that Plaintiff's success in his Article 78 proceeding against
Defendant Walker carries no preclusive effect with regard to his prisoner civil rights claims
against Defendant Seitz (or Defendant Walker) in this action.  Setting aside the issue of whether
Judge Corning had the power to award the full measure of monetary damages sought by Plaintiff
in this action, there is the fact that Defendant Seitz was not a party to Plaintiff's Article 78
proceeding, and Defendant Walker was sued only in his official capacity.  *See Zavaro v.
Coughlin*, 775 F. Supp. 84, 87-88 (W.D.N.Y. 1991) (judgment entered in Article 78 proceeding
brought by prison inmate for relief from discipline unconstitutionally imposed in reliance on
uncorroborated testimony of confidential informers could not be given preclusive effect in
inmate's civil rights actions against disciplinary hearing officer and DOCS Commissioner, where
hearing officer was not even named as party in Article 78 proceeding, and Commissioner was
sued in Article 78 proceeding only in his official capacity and thus had no opportunity to raise
defenses available to him in civil rights action, including lack of personal involvement), *aff'd*,
970 F.2d 1148 (2d Cir. 1992).

there even an allegation that Defendant Seitz somehow caused those Committee members to (allegedly) shirk their duty.  (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

As for Defendant Walker, there is no record evidence that he approved the results of the reviews of the Periodic Review Committee (on January 30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and March 6, 1998) maliciously, that is, *knowing* Plaintiff's confinement to administrative segregation to be wrongful.  For example, Plaintiff does not even allege or argue that Defendant Walker *knew* that the Periodic Review Committee was (as Plaintiff asserts) not physically meeting when it conducted its review of Plaintiff's administrative segregation status.  (*See generally* Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 3, at 6-8, 12 [Plf.'s Memo. of Law]; Dkt. No. 85, Part 4, ¶¶ 8-12 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 23-31 [Exs. E-F to Plf.'s Decl.].)

Plaintiff is reminded that, according to Section 301.4(d) of the version of DOCS Directive 4933 that he submitted to the Court, a facility superintendent does not make a "final determination" of the "results" of the Periodic Review Committee's review of an inmate's administrative segregation status until those results are "forwarded, in writing, to the superintendent."  (Dkt. No. 85, Part 4, at 21-22 [Ex. D to Plf.'s Decl., attaching version of Directive 4933 dated 12/30/98].)  As a result, a facility superintendent (such as Defendant Walker) would not, under DOCS Directive 4933, participate in a Periodic Review Committee's review of an inmate's administrative segregation status sufficient to notify him that the review was somehow inadequate.  Furthermore, as the superintendent of Auburn C.F., Defendant Walker was entitled to rely on his subordinate correctional officers (including the three members of the Periodic Review Committee) to conduct an appropriate investigation of an issue at the

17

facility, without personally involving Defendant Walker in that issue.[27]

The closest that Plaintiff comes to making any connection at all between the pre-June 20, 1998, actions of Defendants Seitz and Walker, described above, and Defendant Seitz's statement on June 20, 1998, is when he asserts that unidentified corrections officers in S.H.U. told him, at some point between June 19, 1998, and June 21, 1998, that "word came back . . . per Superintendent Walker . . . that you aren't stepping foot back in [general population]." (Dkt. No. 85, Part 4, ¶ 18 [Plf.'s Decl.].)  For the sake of argument, I will set aside (1) the potential hearsay problem with this piece of evidence, (2) the fact that the evidence is so late-blossoming, vague, and self-serving that a reasonable fact-finder would have great difficulty undertaking the suspension of disbelief necessary to believe it,[28] (3) the fact that the unidentified corrections

---

[27]     *See Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *6 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J., adopting Report-Recommendation by Lowe, M.J., on *de novo* review) (DOCS Commissioner was entitled to delegate to high-ranking subordinates responsibility to read and respond to complaints by prisoners without personally involving DOCS Commissioner in constitutional violations alleged) [citations omitted]; *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (DOCS Commissioner was not personally involved in alleged constitutional violation where he forwarded plaintiff's letter of complaint to a staff member for decision, and he responded to plaintiff's letter inquiring as to status of matter); *Swindell v. Supple*, 02-CV-3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb. 3, 2005) ("[A]ny referral by Goord of letters received from [plaintiff] to a representative who, in turn, responded, without more, does not establish personal involvement."); *Garvin v. Goord*, 212 F. Supp.2d 123, 126 (W.D.N.Y. (2002) ("[W]here a commissioner's involvement in a prisoner's complaint is limited to forwarding of prisoner correspondence to appropriate staff, the commissioner has insufficient personal involvement to sustain a § 1983 cause of action.").

[28]     It bears noting that the June 22, 1998, letters that Plaintiff wrote to Judge Corning and the New York State Attorney General's Office regarding the refusal of Auburn C.F. to release him from administrative segregation despite Judge Corning's decision of May 26, 1998, mentions the malicious statement (allegedly) made by Defendant Seitz on June 20, 1998, and another malicious statement made by Defendant Gummerson on June 19, 1998, but is conspicuously silent as to any order by Defendant Walker, issued between June 19, 1998, and June 21, 1998, that Plaintiff was not going to return to general population.  (Dkt. No. 85, Part 4, at 39-45 [Ex. I to Plf.'s Decl.].)  It bears noting also that any allegation regarding the referenced order by

officers in question did not state that, whenever Defendant Walker made the statement, he did so

knowing of the decision of Judge Corning, and (4) the fact that the statement does not in any way

suggest that Defendant Walker made the statement as part of a conspiracy with Defendant Seitz.

The more serious problem with this piece of evidence is that, as explained above, there is no

record evidence suggesting that the referenced statement by Defendant Seitz was *preceded by* any

malicious (or knowingly wrongful) acts by Defendant Seitz.

As a result, I find that no rational fact finder could conclude, from the current record, that

the relevant acts of Defendants Walker and Seitz that occurred outside of the relevant statutory

period (i.e., between January 12, 1998, and June 19, 1998) were *sufficiently connected* to the

relevant acts of those individuals that occurred within the statutory period (i.e., between June 20,

1998, and June 22, 1998) for purposes of the continuing-violation doctrine.

In any event, even if I had found that there was such a sufficient connection, I would find

that compelling circumstances do not exist to warrant the application of the continuing-violation

doctrine.  Compelling circumstances (for purposes of the continuing-violation doctrine) exist

> where the unlawful conduct takes place over a period of time, making
> it difficult to pinpoint the exact day the violation occurred; where there
> is an express, openly espoused policy that is alleged to be
> discriminatory; or where there is a pattern of covert conduct such that
> the plaintiff only belatedly recognizes its unlawfulness.

*Yip v. Bd. of Trustees of State Univ. of N.Y.*, 03-CV-0959, 2004 WL 2202594, at *4 (W.D.N.Y.

Sept. 29, 2004) [internal quotation marks and citations omitted].

Here, although the unlawful conduct at issue took place over a period of time, that fact

_____

Defendant Walker is not contained in Plaintiff's Fourth Amended Complaint.  (*See generally*
Dkt. No. 16, ¶ 6 [Plf.'s Verified Fourth Am. Compl.].)

has in no way made it difficult for Plaintiff to pinpoint the exact dates on which the alleged

violations occurred.  To the contrary, his Fourth Amended Complaint and papers in opposition to

Defendants' motion are replete with allegations that events (including violations) occurred on

exact dates.  (*See*, *e.g.*, Dkt. No. 16, ¶¶ 4[b][i], 4[b][ii], 6[2], 6[4]-6[17], 6[19], 6[23], 6[30]-

6[34], 6[36], 6[38], 6[41]-6[50], 6[52]-6[58], 6[61]-6[63] [Plf.'s Fourth Am. Compl.]; Dkt. No.

85, Part 2, ¶ 9 [Plf.'s Rule 7.1 Response]; Dkt. No. 85, Part 4, ¶¶ 5-7, 9-10, 13-17, 19-22 [Plf.'s

Decl.].)

        Moreover, while Plaintiff has alleged that the wrongful actions taken against him were

part of a conspiracy, he has not adduced evidence that the wrongful actions alleged were part of

an express and openly espoused *policy*.  Nor has he adduced evidence that any such policy

*discriminated* against him because of his membership in any protected class of individuals (e.g.,

classifications based on race, religion, etc.).  Plaintiff would no doubt argue that Defendants Seitz

and Walker treated him differently from other prisoners between June 19, 1998, and June 22,

1998 (by not releasing him from S.H.U.) due to the fact that he had won his Article 78

proceeding in New York State Supreme Court on May 26, 1998.  However, any such disparate

treatment (even if it did occur) came months *after* Defendant Seitz and Walker's actions in

January, February, and March of 1998, which (again) have not been shown to have been

malicious.  Therefore, the two groups of actions cannot be rationally found to have been united

under the umbrella of a single "policy" of disparate treatment.

        Finally, there is no record evidence that the wrongful actions in question were committed

*covertly* such that Plaintiff only belatedly recognized their unlawfulness.  To the contrary, the

record is clear that Plaintiff knew of the wrongful actions at the time they were committed.  That

is why, on January 18, 1998, he filed with DOCS an appeal from the decision to confine him in administrative segregation.  (Dkt. No. 16, ¶ 6[6] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 32 [Ex. G to Plf.'s Decl.].)  That is also why, by the third week of January of 1998, he commenced a hunger strike in protest of his confinement in administrative segregation.  (Dkt. No. 85, Part 4, at 29 [Ex. F to Plf.'s Decl.]; Dkt. No. 16, ¶ 6[20] [Plf.'s Verified Fourth Am. Compl.].)  That is also why, on March 28, 1998, he filed an Article 78 petition in New York State Court.  (Dkt. No. 16, ¶ 6[11] [Plf.'s Verified Fourth Am. Compl.]; Dkt. No. 85, Part 4, at 35 [Ex. H to Plf.'s Decl.].)

Simply stated, once Plaintiff's appeal to DOCS was denied on March 11, 1998 (and thus his administrative remedies were exhausted), he could have, but failed to, file a complaint in this Court complaining of the wrongful actions that had occurred thus far.  There was no compelling circumstance that prevented him from filing a complaint regarding those actions until June 20, 1998.  Thus, there is no reason to toll the starting of the three-year limitations period until that date.

For both of the above-stated alternative reasons, I find that the continuing violation doctrine does *not* apply to the acts of Defendants Walker and Seitz that occurred outside of the relevant statutory period (i.e., between January 12, 1998, and June 19, 1998), so as to render timely Plaintiff's claims concerning those acts.  As a result, I recommend dismissal of Plaintiff's Fourth Cause of Action based on the three-year statute of limitations governing that claim.

## 2.        Protected-Liberty-Interest Requirement

The parties' arguments with regard to the protected-liberty-interest requirement present
the issue of whether Plaintiff's confinement in the Auburn C.F. Infirmary for a total of 101 days,
together with confinement in the Auburn C.F. S.H.U. for a total of 60 days, constituted an
"atypical and significant hardship on [Plaintiff] in relation to the ordinary incidents of prison
life," under *Sandin v. Connor*, 515 U.S. 472, 484 (1995).

I have been unable to locate any decisions from within the Second Circuit addressing
when an inmate's confinement in a segregated portion of a correctional facility's infirmary may be
an atypical and significant hardship.  However, Plaintiff has adduced record evidence that the
restrictions he experienced in the Auburn C.F. Infirmary were generally harsher than those he
experienced in the Auburn C.F. S.H.U.  (*See* Dkt. No. 85, Part 4, ¶¶ 23-25 [Plf.'s Decl.,
describing conditions in Auburn C.F. Infirmary].)  As a result, for purposes of Defendants'
second motion for summary judgment, I will treat the entire 161-day period in question as a
continuous period of administrative segregation under conditions of confinement that varied
and/or alternated in their level of restrictiveness.

In order to determine whether Plaintiff possessed a protected liberty interest in avoiding
the administrative segregation that he experienced during the 161-day period in question, it is
necessary to consider not simply the length of that confinement but the specific circumstances of
that confinement (and whether they were harsher than ordinary).  *Brooks v. DiFasi*, 112 F.3d 46,
49 (2d Cir. 1997); *Vasquez v. Coughlin*, 2 F. Supp.2d 255, 259 (N.D.N.Y. 1998) (McAvoy, C.J.).

Here, at most, the record evidence establishes that the conditions of Plaintiff's segregated
confinement during the time in question were as follows:

(1) for all 161 days in question, he was deprived of the opportunity to work and attend schooling out of his cell; he was deprived of "grooming equipment," "hygiene products," "personal food," and television; and he was allowed only restricted visitation and law library access;

(2) for the 60 days during which he was confined to a cell in the Auburn C.F. S.H.U., he was confined to that cell for twenty-three (23) hours per day; he was allowed into the yard for one hour per day, where he could exercise, and "play hardball and cards" and converse with other inmates; he was allowed (as clothing) two sets of state-issued pants and shirts, and a sweatshirt; he was provided "good heating"; and he was allowed to possess "personal books and correspondence[] and family pictures"; and

(3) for the 101 days during which he was confined to a hospital room in the Auburn C.F. Infirmary, he was confined to his room for twenty-four (24) hours per day and not allowed to converse or play with other inmates; he was allowed (as clothing) only "one pair of under-clothes and socks" and a "thin linen-cotton hospital gown"; he was subjected to "cold temperatures"; and he was not allowed to possess "personal books and correspondence[] and family pictures." (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl., describing the conditions in the Auburn C.F. Infirmary, and comparing those conditions to the conditions in the Auburn C.F. general population].)

The conditions of confinement that Plaintiff experienced during the 60 days he spent in the Auburn C.F. S.H.U. appear to mirror the conditions of confinement ordinarily experienced by inmates confined to Special Housing Units in other correctional facilities within the New York

State DOCS.[29]  Moreover, I can find no evidence in the record that, during the 101 days which

Plaintiff spent in the Auburn C.F. Infirmary (which Plaintiff characterizes as the harshest portion

of his administrative confinement), he was *completely* denied clothing, medicine and adequate

nutrition (e.g., calories, protein, etc.), or that he was *in any way* denied running water, showers

and bedding.  (Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.].)

   Numerous district courts in this Circuit have issued well-reasoned decisions finding no

atypical and significant hardship experienced by inmates who served sentences in S.H.U. of 161

days or more, under conditions of confinement that were, to varying degrees, more restrictive

than those in the prison's general population.[30]  Several of those cases have also recognized (1)

---

[29]    *See Colon v. Howard*, 215 F.3d 227, 230 (2d Cir. 2000) (describing the following
conditions as "normal" conditions of S.H.U. confinement in New York: "Colon was placed in a
solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison
yard for one hour a day . . ., limited to two showers a week, and denied various privileges
available to general population prisoners, such as the opportunity to work and obtain out-of-cell
schooling.  Visitors were permitted, but the frequency and duration was less than in general
population.  The number of books allowed in the cell was also limited.  As to duration, Colon
was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-
304.14).

[30]    *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y.
Apr. 17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to
numerous conditions of confinement that were more restrictive than those in general population,
did not constitute atypical and significant hardship in relation to ordinary incidents of prison
life); *accord*, *Husbands v. McClellan*, 990 F. Supp. 214, 217-19 (W.D.N.Y. 1998) (180 days in
S.H.U. under numerous conditions of confinement that were more restrictive than those in
general population); *Warren v. Irvin*, 985 F. Supp. 350, 353-56 (W.D.N.Y. 1997) (161 days in
S.H.U. under numerous conditions of confinement that were more restrictive than those in
general population); *Ruiz v. Selsky*, 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y. 1997)
(192 days in S.H.U. under numerous conditions of confinement that were more restrictive than
those in general population); *Horne v. Coughlin*, 949 F. Supp. 112, 116-17 (N.D.N.Y. 1996)
(Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more
restrictive than those in general population); *Nogueras v. Coughlin*, 94-CV-4094, 1996 WL
487951, at *4-5 (S.D.N.Y. Aug. 27, 1996) (210 days in S.H.U. under numerous conditions of
confinement that were more restrictive than those in general population); *Carter v. Carriero*, 905

the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the

number of showers allowed per week) are placed even on inmates in the general population,[31]

and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected

experience for an inmate in the general population of a New York State correctional facility,[32]

especially for an inmate serving a sentence of 30 years to life in a maximum-security correctional

---

F. Supp. 99, 103-04 (W.D.N.Y. 1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

[31]     *See, e.g., Husbands*, 990 F. Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population.  For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily.  [7 NYCRR] § 304.3.  This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements. . . .  SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, id. § 320.3(d)(1).  SHU inmates are confined to their cells approximately twenty-three hours a day.  General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends. . . .  Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord*, *Warren*, 985 F. Supp. at 354-55; *see also Ruiz*, 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population.  Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

[32]     *See, e.g., Husbands*, 990 F. Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question.  With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there.  Lengthy disciplinary confinement is prevalent in New York State prisons.  In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions.  7 NYCRR § 254.7(a)(1)(iii).  As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons. . . .  Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days.  These statistics suggest that lengthy confinement in SHU–for periods as long as or longer than [the plaintiff's 180-day] stay–is a normal element of the New York prison regime."); *accord*, *Warren*, 985 F. Supp. at 354.

facility (as Plaintiff appears to be).[33]

Under the circumstances, I simply cannot find, based on the current record, that the 161 days in question constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (causing Plaintiff to possess a protected liberty interest that conferred upon him a right to procedural due process).

I note that, in *Sandin v. Connor*, the Supreme Court noted that an involuntary commitment to a state mental hospital would be a hardship that would qualify as "atypical and significant," because of the "stigmatizing consequences" caused by such a confinement. *Sandin v. Connor*, 515 U.S. 472, 479, n.4 (1995). However, here, the Auburn C.F. Infirmary was not a mental hospital. Moreover, it is difficult to characterize Plaintiff's stay there as *involuntary*, since that stay was caused by his choice to conduct a "hunger strike." (Stated differently, who *caused* Plaintiff to be placed in the Auburn C.F. Infirmary is a relevant issue in an atypical-and-significant-hardship analysis.)[34]

In the alternative, even if I were to find that the 161 days at issue constituted an atypical and significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process), I can find no admissible evidence in the record that Plaintiff was denied any of the process to which he would have been due during the period of January

---

[33]     *See* N.Y.S. DOCS Inmate Locator Service http://nysdocslookup.docs.state.ny.us [last visited May 29, 2008].

[34]     *See Goros v. Pearlman*, 03-CV-1303, 2006 U.S. Dist. LEXIS 19661, at *22-24 (N.D.N.Y. Feb. 21, 2006) (DiBianco, M.J..) (reasoning that, in determining whether plaintiff's confinement to prison medical unit constituted an atypical and significant hardship, it was necessary to determine who was responsible for causing plaintiff to be classified as "patient prisoner"), *accepted in pertinent part on de novo review*, 2006 U.S. Dist. LEXIS 19658, at *2 (N.D.N.Y. March 24, 2007) (McAvoy, J.).

through March of 1998.[35]   For example, he received notice and a hearing; he received the

opportunity to appeal the written hearing decision; and he received several written memoranda

regarding his administrative segregation status signed by Defendant Walker and three members

of the Periodic Review Committee.  Most importantly, even if some sort of due process violation

did occur during the period of January through March of 1998, I can find no evidence in the

record that either Defendant Seitz or Defendant Walker committed that due process violation.

    As explained above in Part II.A.1. of this Report-Recommendation, a prisoner enjoys no

right under the Fourteenth Amendment (or any other constitutional provision) against being

issued an administrative segregation recommendation that turns out to be false.  Moreover, no

record evidence exists that Defendant Seitz gave false testimony at Plaintiff's administrative

segregation hearing on January 14 and 15, 1998 (for example, by falsely stating that he had

knowledge of the credibility of the three confidential informants at issue).  Finally, even if

Defendant Seitz did somehow violate DOCS Directive 4933 when he approved the results of the

Periodic Review Committee's review of Plaintiff's administrative segregation status (on January

30, 1998, February 6, 1998, February 13, 1998, February 20, 1998, February 27, 1998, and

March 6, 1998), a violation of a DOCS Directive is not a violation of the Constitution, or of 42

U.S.C. § 1983.

    For these reasons, I recommend that, in the alternative, Plaintiff's Fourth Cause of Action

---

[35]     "[Courts] examine procedural due process questions in two steps: the first asks
whether there exists a liberty or property interest which has been interfered with by the State . . . ;
the second examines whether the procedures attendant upon that deprivation were
constitutionally sufficient . . . ."  *Kentucky Dept. of Corr. v. Thompson*, 490 U.S. 454, 460
(1989).

should be dismissed due to his failure to adduce sufficient record evidence to demonstrate that he enjoyed a right of procedural due process with regard to the confinement in question, or that (even if he did enjoy such a right) Defendants Seitz or Walker denied him the process to which he was due.

**B.     Plaintiff's Fifth Cause of Action**

Construed with the extra degree of leniency with which *pro se* civil rights claims are generally afforded, Plaintiff's Fifth Cause of Action alleges as follows: between **June 19, 1998**, and **June 22, 1998**, **Defendants Walker**, **Seitz**, and **Gummerson** violated Plaintiff's right to due process under the **Fourteenth Amendment**, and his right "to access . . . the court and . . . seek redress" under the **First Amendment**, when they intentionally delayed his release from the Auburn C.F. S.H.U. for three days (i.e., from June 19, 1998, to June 22, 1998), despite learning (on June 19, 1998) that the Cayuga County Supreme Court had issued an order directing that Plaintiff be released from the S.H.U.  (Dkt. No. 16, ¶¶ 3[g], 6[11]-6[17], 7 [Plf.'s Fourth Am. Compl., asserting his Fifth Cause of Action].)

Defendants argue that Plaintiff's Fifth Cause of Action should be dismissed because his confinement at the Auburn C.F. S.H.U. from June 19, 1998, to June 22, 1998, did not present the type of "atypical, significant hardship" that is required to create a protected liberty interest for purposes of a procedural due process claim under the Fourteenth Amendment.  (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Plaintiff responds to Defendants' argument regarding his Fifth Cause of Action with two arguments.  First, Plaintiff argues that, in trying to persuade the Court that Plaintiff's wrongful confinement in S.H.U. between June 19, 1998, and June 22, 1998, was too short to constitute an

"atypical, significant hardship" for purposes of a due process claim, Defendants fail to take into account the *intentional* and *retaliatory* nature of that four-day deprivation, which in and of itself created a protected liberty interest.  (Dkt. No. 85, Part 3, at 10-11, 13-14 [Plf.'s Memo. of Law, arguing that "Defendants[] incorrectly couch this claim as a mere 4-day delay to release him from SHU" and that "plaintiff need not show Sand[l]in's atypicality [requirement] because the injury [that Plaintiff experienced consisted of] the retaliatory conduct itself."].)  Second, Plaintiff argues that Defendants have ignored the First Amendment claim contained in his Fifth Cause of Action. (*Id*. at 10-13.)  In so doing, Plaintiff argues that he was attempting to assert *two* types of First Amendment claims in his Fourth Amended Complaint.  (*Id*.)  The first type of First Amendment claim was the "access to courts" claim described above.  (*Id*.)[36]  The second type of First Amendment claim (according to Plaintiff) was a *retaliation* claim.  (*Id*.)  Specifically, he argues that, in his Fourth Amended Complaint, he intended to allege, in part, that, when Defendants Walker, Seitz and Gummerson intentionally delayed Plaintiff's release from S.H.U. between June 19, 1998, and June 22, 1998, they were retaliating against him for having filed (and won) an Article 78 proceeding in Cayuga County Supreme Court regarding his confinement in S.H.U. (*Id*.)[37]

---

[36]      I note that, while Plaintiff does not focus much on his access-to-courts claim in his opposition papers, I do not liberally construe anything in those papers as withdrawing his access-to-courts claim, which he rather expressly asserted in his Fourth Amended Complaint. (*See* Dkt. No. 85, Part 3, at 11, 12 [Plf.'s Memo. of Law, arguing that there is "no doubt that plaintiff [alleged] . . . that Defendants infringed upon his right to seek redress and access of the courts," and that "the strongest argument in plaintiff's favor is that defendants . . . cause[d] injury [to plaintiff] by delaying his release from SHU in violation of his First . . . Amendment right[] to access of the courts . . . ."].)

[37]      For example, he cites Paragraph "6(60)" of his Fourth Amended Complaint in which he alleges that, on or about April 30, 1998, Auburn C.F. First Deputy Superintendent Gary

Defendants reply to Plaintiff's response regarding his Fifth Cause of Action by arguing that Plaintiff's First Amendment claim should be dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of "retaliation" is "last-minute" (or late-blossoming).  (Dkt. No. 88, Part 1, at 2-3.)

### 1.      Procedural Due Process Claim Under the Fourteenth Amendment

In support of his argument that he "need not show Sand[l]in's atypicality [requirement] because the injury [that he experienced consisted of] the retaliatory conduct itself," Plaintiff cites two cases: *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994), and *Hershberger v. Scaletta*, 33 F.3d 955 (8th Cir. 1994).  The problem is that neither of these two cases stands for such a proposition.

In *Dixon v. Brown*, an inmate alleged that a correctional officer had violated his rights under the First Amendment by filing a false disciplinary charge against him in retaliation for his having filed a prison grievance against the officer.  38 F.3d 379, 379 (8th Cir. 1994).  The district court granted the officer's motion for summary judgment on the ground that, because the prison disciplinary committee had dismissed the officer's disciplinary charge against the inmate, the inmate had not been punished and thus had not suffered "an independent injury"  *Id.*  The Eighth Circuit reversed, holding that, when an inmate has shown that a correctional officer has filed a false disciplinary charge against the inmate in retaliation for having filed a prison grievance against the officer, the inmate need not show an "independent injury" (such as being punished following a conviction on the disciplinary charge) because the retaliatory filing of the false charge is *in and of itself* an injury.  *Id.* at 379-80.  Such a holding, which regards the requirement

---

Hodges (who has been dismissed as a defendant in this action) "menacingly told plaintiff that . . . if he wins his Article 78 [proceeding], he's going to get hit was another [sentence in Administrative Segregation]."  (*Id.* at 11-12.)

for establishing a retaliation claim filed under the First Amendment, has nothing to do with the requirement for a procedural due process claim filed under the Fourteenth Amendment.

Plaintiff cites *Hershberger v. Scaletta*, for the proposition that "a systematic denial of inmates' constitutional right of access to the courts is such a fundamental deprivation that it is an injury in itself." 33 F.3d 955, 956 (8th Cir. 1994) [citations omitted]. As an initial matter, in the current action, the Court is not faced with any record evidence (or even an allegation) that there has been a systematic denial of a right of access to the courts possessed by multiple *inmates*. Moreover, *Hershberger* was decided the year *before* the Supreme Court revised its due process analysis in *Sandlin v. Connor*, narrowing its focus to whether or not the restraint in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S. 472, 483-84 (1995).

Furthermore, I have found no cases suggesting that *Sandin*'s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of procedural due process violations. *See*, *e.g.*, *Wells v. Wade*, 36 F. Supp.2d 154, 158-59 (S.D.N.Y. 1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris*, 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D. Ark. Dec. 7, 2007) (finding that prisoner's allegations, arising from placement in segregated

housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process

claim, and but that his allegations–arising from same placement in segregated housing–*did*

plausibly suggest that defendants took adverse action against him because he engaged in

protected activity for purposes of retaliation claim); *Harris v. Hulkoff*, 05-CV-0198, 2007 WL

2479467, at *4-5 (W.D. Mich. Aug. 28, 2007) (first considering whether evidence existed that

plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for

purposes of due process claim, and *then* considering whether evidence existed that defendants

took adverse action against plaintiff, by placing him on suicide watch, because he engaged in

protected activity for purposes of retaliation claim).

  As a result, I reject Plaintiff's argument that he is excused from having to satisfy *Sandin*'s

atypicality requirement simply by alleging (and presumptively adducing some evidence) that he

has been subjected to retaliation.  I turn, then, to the issue of whether Plaintiff's wrongful

confinement in S.H.U. between June 19, 1998, and June 22, 1998, constituted an "atypical,

significant hardship" for purposes of a due process claim.

  I must answer this question in the negative for the reasons stated above in Part II.A.2. of

this Order and Report-Recommendation, and for the reasons advanced (and cases cited) by

Defendants in their memorandum of law.  (Dkt. No. 81, Part 5, at 4-8 [Defs.' Memo. of Law].)

Simply stated, considering the three-day length of Plaintiff's continued confinement in the

Auburn C.F. S.H.U. *and* the specific circumstances of that continued confinement (which

included one hour out of his cell per day, "good heating," and the ability to possess "personal

books and correspondence[] and family pictures," *see* Dkt. No. 85, Part 4, ¶ 25 [Plf.'s Decl.]), I

find that the three-day continued confinement at issue did not constitute an atypical and

significant hardship in relation to the ordinary incidents of prison life (conferring on Plaintiff a right to procedural due process).

For all of these reasons, I recommend that the procedural due process claim asserted in Plaintiff's Fifth Cause of Action be dismissed for insufficient record evidence to create a genuine issue of material fact, under Fed. R. Civ. P. 56.

I note that, while I do not rely on this evidence in making my recommendation, I believe it worth mentioning that at least some evidence exists in the record that, during the three-day time period in question, various officials at Auburn C.F. were attempting to transfer Plaintiff to another correctional facility in order to avoid his being returned to Auburn C.F.'s general population, where he would have access to the three informants whose statements had been the impetus for his original placement in administrative segregation.[38]  I believe it would not be extraordinary (or atypical) for a prisoner to reasonably expect to have his release from administrative segregation briefly delayed under such a circumstance.

### 2.    Claims Under the First Amendment

Plaintiff is correct when he argues that Defendants, in their *initial* memorandum of law in support of their motion, ignored the First Amendment claim contained in his Fifth Cause of

---

[38]    (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson . . . retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord*, Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord*, Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

Action.  (Dkt. No. 85, Part 3, at 11-13.)  Defendants are partly correct, and partly incorrect, when

they argue, in their *reply* memorandum of law, that Plaintiff's First Amendment claim should be

dismissed because (1) his allegations of "conspiracy" are "conclusory," and (2) his allegation of

"retaliation" is "last-minute" (or late-blossoming).  (Dkt. No. 88, Part 1, at 2-3.)

### a.    Access-to-Courts Claim

Setting aside for the moment whether or not Plaintiff's Fourth Amended Complaint has

alleged facts plausibly suggesting a First Amendment *retaliation claim*, that Complaint has

alleged facts plausibly suggesting a First Amendment *access-to-courts claim*–at least against

Defendants Seitz and Gummerson.[39]

Plaintiff's "Fifth Cause of Action" alleges as follows:

> The action of defendants WALKER, GUMMERSON, and SEITZ
> stated in paragraph 6(13-15), in intentionally delaying [Plaintiff's]
> release from the 'SHU' after his successful Article 78 [petition],
> infringed upon his right to access to the court and to seek redress, in
> violation of his First and Fourteenth Amendment [r]ights [under] the
> United States Constitution.

---

[39]    *See Carroll v. Callanan,* 05-CV-1427, 2007 WL 965435, at *5-6 (N.D.N.Y.
March 30, 2007) (Kahn, J.) (describing elements of retaliation claim arising under First
Amendment as different than elements of access-to-courts claim arising under First Amendment)
[citing cases]; *Stokes v. Goord*, 03-CV-1402, 2007 WL 995624, at *5-6 (N.D.N.Y. March 30,
2007) (Kahn, J.) (describing elements of retaliation claim arising under Constitution as different
than elements of access-to-courts claim arising under Constitution); *Gonzalez-Cifuentes v.
Torres*, 04-CV-1470, 2007 WL 499620, at *4-6 (N.D.N.Y. Feb. 13, 2007) (Sharpe, J.)
(describing elements of retaliation claim arising under First Amendment different than elements
of access-to-courts claim arising under First Amendment); *Burke v. Seitz*, 01-CV-1396, 2006 WL
383513, at *1, 6-7, & n.2 (N.D.N.Y. Feb. 13, 2006) (Sharpe, J.) (describing elements of
retaliation claim arising under First Amendment as different than elements of access-to-courts
claim arising under First Amendment); *Colondres v. Scoppetta,* 290 F. Supp.2d 376, 381-82
(E.D.N.Y. 2003) (recognizing distinction between [1] an access-to-courts claim arising under
First Amendment and/or other constitutional provisions and [2] a retaliation claim arising under
First Amendment) [citing cases].

(Dkt. No. 16, "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)  In Paragraphs "6(13)" through "6(15)" of his Fourth Amended Complaint, Plaintiff alleges facts plausibly suggesting that (1) on the morning of June 19, 2008, a corrections officer by the name of "Exner" informed Plaintiff that he had won his Article 78 proceeding and would be released into the prison's general population later than morning, (2) on the evening of June 19, 2008, Defendant Gummerson did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor, and (3) on the evening of June 20, 2008, Defendant Seitz did not release him from S.H.U. even though he knew that the Cayuga County Supreme Court had issued a decision in Plaintiff's favor.  (*Id*. at ¶¶ 6[13]-6[15].)

Indeed, in my Report-Recommendation of March 30, 2006 (addressing Defendants' first motion for summary judgment), I expressly found that Plaintiff's Fifth Cause of Action contained a First Amendment access-to-courts claim against Defendants Seitz, Gummerson and *Walker*. (Dkt. No. 62, at 13, 30.)

In their second motion for summary judgment, the only conceivable argument Defendants offer as to why Plaintiff's First Amendment access-to-courts claim should be dismissed is that Plaintiff's allegation of a "conspiracy" is "conclusory."  (Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-3.)  I interpret this argument as meaning that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Walker (who was the superintendent of Auburn C.F. during the time in question) caused, through some kind of conspiratorial behavior, Defendants Gummerson and Seitz to not release Plaintiff from S.H.U. on the evening of June 19, 2008, the entirety of June 20 and 21, 2008, and the morning of June 22, 2008, despite the fact that the Cayuga County Supreme Court had issued

a decision in Plaintiff's favor.  (Dkt. No. 16, "Fifth Cause of Action," & ¶¶ 6[12]-[17].)  I also interpret Defendants' argument as attacking that allegation of conspiracy as conclusory.  (Dkt. No. 88, Part 1, at 3.)

As a result of this argument, I have carefully reconsidered my finding (in my Report-Recommendation of March 30, 2006) that Plaintiff has, in his Fourth Amended Complaint, alleged facts plausibly suggesting that *Defendant Walker* somehow violated Plaintiff's First Amendment right of access to the courts.  Having done so, I now agree with Defendants that the only specific access-to-courts allegation that Plaintiff levels against Defendant Walker is an implicit allegation that Defendant Walker (who was the superintendent of Auburn C.F.), somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to ignore the decision issued by the Cayuga County Supreme Court.  I also agree with Defendants that this allegation, which is woefully vague and speculative, fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged.[40]

For these reasons, I recommend that the Court dismiss Plaintiff's First Amendment access-to-courts claim against Defendant Walker.  I recommend that this Order of Dismissal be either (1) issued on Defendants' motion for summary judgment (which may, of course, assert a failure-to-state-a-claim argument),[41] or (2) issued *sua sponte* pursuant to 28 U.S.C. §§

---

[40]    I note that, even if I were to not find that Plaintiff's access-to-courts claim against Defendant Walker fails to meet the pleading standard required by Fed. R. Civ. P. 8 and 12, I would find that the claim fails to meet the evidentiary standard required by Fed. R. Civ. P. 56.

[41]    "Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnise General Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) [citations omitted], *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38

1915(e)(2)(B)(ii), 1915A.

However, I do not liberally construe Plaintiff's access-to-court claim against *Defendant Seitz* as depending on any sort of conspiracy between him and someone else (such as Defendants Gummerson and/or Walker).  Rather, that claim stands on its own.  (Dkt. No. 16, "Fifth Cause of Action," &  ¶ 6[15].)  Nor do I liberally construe Plaintiff's access-to-court claim against *Defendant Gummerson* as depending on any sort of conspiracy between him and someone else (such as Defendants Seitz and/or Walker).  Rather, that claim also stands on its own.  (*Id*. at "Fifth Cause of Action," &  ¶ 6[14].)  The issue, then, is whether these two claims are specific enough to survive an analysis under Fed. R. Civ. P. 8(a)(2) and 12(b)(6).

It is well settled that inmates have a First Amendment right to "petition the Government for a redress of grievances."[42]  This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights."[43]  "However, this right is not 'an abstract, freestanding right . . .' and cannot ground a Section 1983 claim without a showing of

---

(S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

[42]     *See* U.S. CONST. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

[43]     *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *modified on other grounds*, *Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.2d 88, 92 (2d Cir. 2004) [citations omitted].

37

'actual injury.'"[44]  As a result, to state a claim for denial of access to the courts, a plaintiff must allege facts plausibly suggesting that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury as a result of that act.[45]

Here, I find that Plaintiff has alleged facts plausibly suggesting both (1) that Defendant Seitz acted *deliberately and maliciously* when he refused to release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (despite knowing that Acting Supreme Court Justice Peter E. Corning had ruled in Plaintiff's favor in his Article 78 proceeding regarding that segregated confinement), and (2) that Plaintiff suffered an *actual injury* as a result of that deliberate and malicious act, namely, he was not released from S.H.U. for another two days.  In addition, I make the same finding with regard to Plaintiff's claim against Defendant Gummerson.

It is all but self-evident that a prison official's knowing refusal to obey a state court order directing an inmate's release from S.H.U. (following that inmate's filing a suit requesting that order) would make that official liable for infringing upon the inmate's right of "access to the courts" under the First Amendment.  The Southern District thoroughly and clearly so explained in a case similar to ours:

> [Plaintiff's] interest in having defendants comply with the Appellate Division's order [releasing him from SHU, issued in plaintiff's Article 78 proceeding]. . . implicates his constitutional right of access to the courts.  The First Amendment to the U.S. Constitution prohibits any law abridging the freedom . . . to petition the government for a redress of grievances.  That freedom . . . encompasses the

---

[44]     *Collins v. Goord,* 438 F. Supp.2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 351 [1996]).

[45]     *Lewis*, 518 U.S. at 353; *Renelique v. Duncan*, 03-CV-1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr. 12, 2007) (Strom, J.); *Howard v. Leonardo*, 845 F. Supp. 943, 946 (N.D.N.Y. 1994) (Hurd, M.J.).

> constitutional right of unfettered access to the courts. . . .
>
> . . . . The right of access is . . . implicated by a state official's knowing refusal to obey a state court order affecting a prisoner's rights. . . . Logic compels the conclusion that if a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated. . . . [Plaintiff's] assertion of this right is not limited by *Sandin* [*v. Connor*, 115 S. Ct. 2293 (1995)], which dealt exclusively with procedural due process and did not address fundamental rights arising elsewhere in the Constitution.  As the Supreme Court explicitly stated [in *Sandin*], 'prisoners . . . retain other protection from arbitrary state action . . . .  They may invoke the First . . . Amendment[] . . . where appropriate. . .' *Sandin*, 115 S. Ct. at 2302, n.11.

*Johnson v. Coughlin*, 90-CV-1731, 1997 WL 431065, at *6-7, 1997 U.S. Dist. LEXIS 11025, at *21-22 (S.D.N.Y. July 30, 1997) [internal quotation marks, citations and emphasis omitted; other emphasis added]; *see also Acre v. Miles*, 85-CV-5810, 1991 WL 123952, at *9, 1991 U.S. Dist. LEXIS 8763, at *27 (S.D.N.Y. June 28, 1991) ("Above all else, such conduct has the effect of denying inmates full access to the courts [under, in part, the First Amendment]. . . .  If a prisoner's initial access to a forum is allowed, but final access to the remedy decreed denied, the prisoner's broader right to petition [the] government for redress of grievances is vitiated.") [internal quotation marks and citations omitted].[46]

Furthermore, it is important to note that a person's right of access to the courts has been found to arise not only under the First Amendment but under other parts of the Constitution, including the Due Process Clause of the Fourteenth Amendment.  *See Monsky v. Moraghan*, 127

---

[46]    *Cf. Woods v. Interstate Realty Co.*, 337 U.S. 535, 538 (1949) ("[A] right which . . . does not supply . . . a remedy is no right at all . . . ."); *Abney v. McGinnis*, 380 F.3d 663, 669 (2d Cir. 2004) ("The defendants' failure to implement the multiple rulings in [the inmate's] favor rendered administrative relief 'unavailable' under the [Prison Litigation Reform Act].") [citations omitted].

F.3d 243, 246 (2d Cir. 1997) ("[T]he source of this right [of access to the courts] has been

variously located in the First Amendment right to petition for redress [of grievances], the

Privileges and Immunities Clause of Article IV, section 2, and the Due Process Clauses of the

Fifth and Fourteenth Amendments.") [citations omitted]; *accord*, *Colondres v. Scoppetta,* 290 F.

Supp.2d 376, 381 (E.D.N.Y. 2003); *Brown v. Stone*, 66 F. Supp.2d 412, 433 (E.D.N.Y. 1999).

This is why courts have specifically held that a prison official's knowing refusal to obey a

state court order directing an inmate's release from S.H.U. would make that official liable *also*

for infringing upon the inmate's personal liberty protected by the *substantive* due process clause

of the Fourteenth Amendment.  Again, the Southern District of New York thoroughly and clearly

so explained:

> A prison official's knowing refusal to obey a state court order
> affecting a prisoner's rights would make that official liable for
> infringing upon the inmate's personal liberty protected by the
> substantive due process clause of the Fourteenth Amendment. . . .
> This is true not only when an official keeps an inmate in prison past
> the date when a court orders his permanent release . . . but also when
> an official disregards a court order for the inmate's temporary release
> for work during daytime hours, . . . *or disregards an order directing
> the inmate's release from SHU*. . . .  This principle is not disturbed by
> *Sandin* [*v. Connor*, 515 U.S. 472 (1995)], since . . . the *Sandin* test
> applies only to determine when a constitutional liberty interest arises
> from state prison regulations, thus requiring certain process to deny
> that liberty interest. . . .  The liberty interest at stake in this case arises
> from the plaintiff's *nonderogable right to be free from restraints or
> punishments that a court has expressly deemed to be improper*.

*Coughlin*, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 [internal quotation

marks, citations and emphasis omitted; other emphasis added]; *see also Acre*, 1991 WL 123952,

at *9, 1991 U.S. Dist. LEXIS 8763, at *26-27 ("[I]t is all but self-evident that a state official's

knowing refusal to obey a state court order affecting a prisoner's rights would make the official

liable under section 1983 for infringing upon the inmate's personal liberty protected by the

substantive due process clause of the Fourteenth Amendment.") [internal quotation marks and

citations omitted]; *cf. Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) ("Like the right of

access to the courts, the right to petition [the government for the redress of grievances] is

substantive rather than procedural and therefore cannot be obstructed, regardless of the

procedural means applied.") [internal quotation marks and citations omitted].[47]

   As to the precise issue of whether the delay alleged by Plaintiff was long enough to

constitute an "actual injury" for purposes of an access-to-courts claim, Plaintiff's Fourth

Amended Complaint alleges that the delay caused by Seitz occurred from "the evening" of June

20, 1998 (when Defendant Seitz allegedly refused to release Plaintiff because "Auburn's

Administration runs the prison, not the Judge") to "[the] afternoon" of June 22, 1998 (when

Plaintiff was released from S.H.U. back into the general population).  (Dkt. No. 16, ¶¶ 6[15]-

6[17] [Plf.'s Fourth Am. Compl.].)  As a result, I liberally construe Plaintiff's Fourth Amended

---

   [47]  *Accord, Fleming v. Dowdell*, 434 F. Supp.2d 1138, 1160 & n.17 (M.D. Ala. 2005)
(recognizing that, where state official knows of court order, yet refuses to comply with it, he
incurs liability under substantive due process clause of Fourteenth Amendment) [citations
omitted]; *Rodriguez v. Northampton County*, 00-CV-1898, 2003 WL 22594318, at *4, n.4, 2003
U.S. Dist. LEXIS 19567, *12, n.4 (E.D. Pa. Oct. 21, 2003) ("A prison official's knowing refusal
to obey a state court order affecting a prisoner's rights would make that official liable for
infringing upon the inmate's personal liberty protected by the substantive due process clause of
the Fourteenth Amendment.") [internal quotation marks and citations omitted]; *Huddleston v.
Shirley*, 787 F. Supp. 109, 111 (N.D. Miss. 1992) ("[I]t is undisputed that [defendant] continued
to confine [plaintiff] in the county jail during the day in direct conflict with the state court order
to release him as specified. . . .  [This] refusal to obey the [court] order violated [plaintiff's]
substantive due process rights."); *Tasker v. Moore*, 738 F. Supp. 1005, 1010-11 (S.D. W. Va.
1990) ("It is beyond peradventure that officials who willfully, intentionally or recklessly keep an
inmate in prison past the date he was ordered released are liable under section 1983 for infringing
upon the inmate's personal liberty protected by the substantive due process clause of the
Fourteenth Amendment.") [citations omitted].

Complaint as alleging that the delay in question was between thirty-six (36) and forty-eight (48) hours in length.[48]  The alleged delay caused by Defendant Gummerson was even longer, his refusal to release Plaintiff allegedly occurred on the evening of June 19, 1998–approximately twenty-four hours before Defendant Seitz's refusal to release Plaintiff.  (*Id*. at ¶ 6[14].)

Delays in releasing prisoners following the issuance of release orders have been found to be actionable under the Constitution even where those delays were much less than thirty-six hours in length.  *See Arline v. City of Jacksonville*, 359 F. Supp.2d 1300, 1308-09 (M.D. Fla. 2005) (jury question was presented as to whether defendants' imprisonment of plaintiff for *two-and-a-half-hours* after plaintiff had been acquitted at criminal trial was unreasonable for purposes of Fourth Amendment); *Lara v. Sheahan*, 06-CV-0669, 2007 WL 1030304, at *4-5, 2007 U.S. Dist. LEXIS 24261, at *11-12 (N.D. Ill. March 30, 2007) (denying defendants' Rule 12[b][6] motion to dismiss with regard to plaintiff's claim that defendants delayed up to *nine hours and fifteen minutes* in releasing him after judge had issued release order, because, depending on evidence, delay could have been unreasonable for purposes of Due Process Clause); *Lewis v. O'Grady*, 853 F.2d 1366, 1368-70 & n.9 (7th Cir. 1988) (jury question was presented as to whether defendants' imprisonment of plaintiff for *eleven hours* after judge had determined he was not the man named in arrest warrant was unreasonable for purposes of Fourth

---

48      Without burdening this already lengthy Report-Recommendation with a detailed and esoteric discussion of semantics, I note that I arrive at this conclusion by reasoning that, by the term "afternoon," Plaintiff meant the period of time between noon and dinnertime (i.e., at approximately 6:00 p.m.), and by the term "evening," Plaintiff meant the period of time between dinnertime and midnight.

and Fourteenth Amendments).[49]  In addition, it should be remembered that Plaintiff has also alleged facts plausibly suggesting that the approximate-two-day delay in question was accompanied by constructive (and perhaps actual) notice on the part of Defendants Seitz and/or Gummerson that Plaintiff's release had been ordered by Judge Corning *more than three weeks before* the evening of June 19 and 20, 1998, i.e., on May 26, 1998.  (Dkt. No. 16, ¶¶ 6[12]-6[15] & "Fifth Cause of Action" [Plf.'s Fourth Am. Compl.].)

As a result of all of the foregoing, I find that Plaintiff has alleged facts plausibly suggesting that the delay he experienced due to the action (or inaction) of Defendants Seitz and Gummerson caused him an "actual injury" for purposes of an access-to-courts claim.

Usually on a motion for summary judgment, when an analysis of the pleading sufficiency of a plaintiff's claims has been completed, it is appropriate to conduct an analysis of the evidentiary sufficiency of that claim.  However, here, Defendants have not challenged Plaintiff's access-to-courts claim against Defendants Seitz or Gummerson on the basis of evidentiary insufficiency.  By not offering any argument that Plaintiff has not adduced any evidence establishing these access-to-courts claims, Defendants have failed to meet their threshold burden with regard to any request for dismissal of those claims under Fed. R. Civ. P. 56 and Local Rule 7.1.  On a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial

---

[49]     *Cf. Brass v. County of Los Angeles*, 328 F.3d 1192, 1195, 1199-1202 (9th Cir. 2003) (record evidence on defendants' motion for summary judgment did not present genuine issue of fact as to whether sheriff's department "processing" policy, which caused thirty-nine hour delay after judge had issued release order, was unreasonable under Fourth and Fourteenth Amendments).

burden of establishing the absence of any genuine issue of material fact.[50]  This initial burden,

while modest, is not without substance.[51]

Furthermore, even if Defendants had offered such argument, I am confident that I would

find that a genuine issue of fact exists with regard to that claim, based on the current record.

(*See, e.g.,* Dkt. No. 85, Part 4, ¶¶ 14-18 [Plf.'s Decl.]; Dkt. No. 85, Part 4, at 40-41 [Ex. I to Plf.'s

Decl., stating approximate time of conversation between Plaintiff and Defendant Seitz on

evening of June 20, 1998]; Dkt. No. 16, ¶¶ 6[12]-[15] [Plf.'s Verified Fourth Am. Compl.].)

---

[50]     Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations . . . of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

[51]     *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 243 (2d Cir. 2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial. . . .  If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented. . . . [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement.  It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that . . . the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted].  This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve . . . [opposition] papers . . . shall be deemed as consent to the granting . . . of the motion . . . unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."*  N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

Simply stated, then, because Plaintiff has alleged facts plausibly suggesting First Amendment access-to-courts claims against Defendants Seitz and Gummerson, and because Defendants have not successfully challenged those claims on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed. As a result, I recommend that Plaintiff's First Amendment access-to-courts claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

One more point bears mentioning before I proceed to an analysis of whether or not Plaintiff has successfully asserted a First Amendment retaliation claim: an argument exists (at least in my opinion) that Judge Corning's judgment need not have been acted on until the deadline by which respondents in the Article 78 proceeding could file an appeal from that judgment had expired, since that judgment (arguably) was not "final" until then.[52] However, it appears that, under the New York Civil Practice Law and Rules, the deadline by which respondents in an Article 78 proceeding can file an appeal from the judgment against them expires thirty-five days after they mail to the petitioner a copy of the judgment and written notice of its entry[53] (which mailing presumably occurred, in this case, on the date of the notice, June 18,

---

[52]     *See Slone v. Herman*, 983 F.2d 107, 110 (8th Cir. 1993) ("We conclude that when Judge Ely's order suspending [plaintiff's] sentence became final and nonappealable, the state lost its lawful authority to hold [plaintiff]. Therefore, any continued detention unlawfully deprived [plaintiff] of his liberty, and a person's liberty is protected from unlawful state deprivation by the due process clause of the Fourteenth Amendment.") [citations omitted]; *cf. Wright v. Rivera*, 06-CV-1725, 2007 U.S. Dist. LEXIS 72218, at *11 (E.D.N.Y. Sept. 25, 2007) (stating that "the judgment in [the plaintiff's] Article 78 proceeding [would] become[] final by the conclusion of direct review or the expiration of the time for seeking such review . . . in state court").

[53]     (Dkt. No. 85, Part 4, at 33 [Ex. H to Plf.'s Decl., attaching "Notice of Entry of Order," dated June 18, 1998, stating that Judge Corning's judgment had been "duly entered . . .

1998).[54]  As a result, such a rule would lead to the rather absurd result that, where the

respondents in an Article 78 proceeding successfully brought by a prisoner confined to S.H.U.

choose to simply *not* mail the prisoner a copy of the judgment and written notice of its entry, the

deadline by which respondents must file an appeal from the judgment (and thus the prisoner's

S.H.U. confinement) would be extended indefinitely–in total frustration of a court judgment that

has not in any way been invalidated.  Rather, I believe that the more sensible rule, and the

operative one, is that the judgment is stayed (for purposes of a subsequent constitutional access-

to-courts claim by the petitioner) only upon the actual filing of a notice of appeal by the

respondent (or the issuance of a court order granting such a stay).[55]  No evidence exists in the

record that such a notice of appeal was filed, or even considered.

### b.    Retaliation Claim

Defendants' argument that Plaintiff has failed to assert a retaliation claim is based on the

fact that the word "retaliation" does not appear in the portion of Plaintiff's Fourth Amended

Complaint labeled "Fifth Cause of Action."  (*Id*.)  This, of course, is true: Plaintiff's "Fifth Cause

of Action" alleges, in pertinent part, that Defendants Walker, Gummerson and Seitz, by

---

and filed in the Clerk's Office, Cayuga County on May 27, 1998"].)

[54]      N.Y. C.P.L.R. § 5513(a); *see also* David Siegel, 1999 Practice Commentary, "Time to Appeal or Move for Leave, In General," C5513:1, reprinted in 7B McKinney's Consolidated Laws of New York Ann., Supplement, p. 82 (West 2005).

[55]      *See Tasker v. Moore*, 738 F. Supp. 1005, 1007, 1011 (S.D. W. Va. 1990) (during stay of judge's release orders pending appeal from those orders, no liability ensued for not complying with those orders); *cf. Coughlin*, 1997 WL 431065, at *7, 1997 U.S. Dist. LEXIS 11025, at *23 (recognizing that it was not until the New York State Appellate Division decided respondents' appeal from the judgment of the New York State Supreme Court granting the inmate's Article 78 petition that prison officials incurred liability for not promptly complying with the judgment granting the Article 78 petition).

"intentionally delaying his release from the 'SHU' after his successful Article 78 [petition],

infringed upon his right to access to the court and to seek redress, in violation of his First . . .

Amendment [r]ights [under] the United States Constitution."  (Dkt. No. 16, "Fifth Cause of

Action" [Plf.'s Fourth Am. Compl.].)

        In order to convert the claim raised in this allegation from an access-to-courts claim to a

retaliation claim, one would have to stretch the meaning of the word "after" in the allegation so

that it means "because of" (thus rendering the allegation as stating that "[Defendants Walker,

Gummerson and Seitz] intentionally delay[ed] his release from the 'SHU' [*because of*] his

successful Article 78 [petition] . . . ."  (*Id*.)  Fortunately, the Court need not engage in such a

reconstruction.

        This is because Plaintiff's "Fifth Cause of Action" begins by expressly stating that the

wrongful conduct that is the subject of the Cause of Action is described in Paragraphs "6(13)"

through "6(15)" of his Fourth Amended Complaint.  (*Id*.)  In those paragraphs, Plaintiff alleges

facts plausibly suggesting that Defendants Gummerson and Seitz did not release him from

S.H.U. (which, of course, constituted adverse action) *because* Plaintiff had filed, and won, his

Article 78 proceeding in Cayuga County Supreme Court (which, of course, was activity protected

under the First Amendment).  (*Id*. at ¶¶ 6[13]-6[15] [alleging that Defendant Gummerson stated

to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga

Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20,

2008, that he was not being released from S.H.U. because "Auburn's Administration runs the

prison, not the judge."] [internal quotation marks omitted].)[56]

It must be remembered that, in the Second Circuit, when a *pro se* civil rights litigant's allegations are construed with special solicitude, the legal claims he has asserted are limited only by what legal claims his factual allegations plausibly suggest, not by his invocation of legal terms. *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised.  In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.") [citations omitted].[57]  Indeed, this is also the case for complaints filed by plaintiffs who are *not* proceeding *pro se*.  *See Albert v. Carovano*, 851 F.2d 561, 571, n.3 (2d Cir. 1988) ("The failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim.  Factual allegations alone are what matters.") [citation omitted], *accord*, *Wynder v. McMahon*, 360 F.3d 73, 75, 77 & n.11 (2d Cir. 2004), *Northrup v. Hoffman of*

---

[56]        Of course, this sort of adoption of allegations by reference to them in a complaint is expressly permitted under the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading . . . .")

[57]        It should be noted that the Second Circuit, in *Phillips v. Girdich*, stated that the legal claims asserted by a *pro se* civil rights litigant are limited only by what legal claims his factual allegations *conceivably* suggest, not what they "plausibly" suggest.  *See* 408 F.3d at 130 ("It is enough that [*pro se* litigants] allege that they were injured, and that their allegations can conceivably give rise to a viable claim . . . . [T]he court's imagination should be limited only by Philips' factual allegations . . . .") [emphasis added; citations omitted].  To the extent that *Phillips* was based on a *conceivability* standard as opposed to a *plausibility* standard, I interpret *Phillips* to have been abrogated by the Supreme Court's decision last year in *Bell Atlantic Corporation v. Twombly*, 127 S. Ct. 1955, 1965-74 (2007) (rather than turn on the "conceivab[ility]" of an actionable claim," the Rule 8 standard turns on the "plausibility" of an actionable claim in that his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]"); *see also Goldstein v. Pataki*, 07-CV-2537, 2008 U.S. App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) ("*Twombly* requires . . . that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level . . . .'") [internal citation omitted].

48

*Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997).

Simply stated, a plaintiff need not necessarily use the legal term "retaliation"[58] in his

complaint in order to assert a retaliation claim.  *See Williams v. Manternach,* 192 F. Supp.2d 980,

986-87 (N.D. Iowa 2002) ("[E]ven though the Complaint does not use the appropriate term of art

for a 'retaliation' claim, it alleges both factual issues that implicated that legal proposition . . .,

and provides sufficient factual allegations to provide for relief on a retaliation theory.") [internal

quotation marks and citations omitted]; *Baltoski v. Pretorius*, 291 F. Supp.2d 807, 810-11 (N.D.

Ind. 2003) ("To state a claim for retaliatory treatment [under the First Amendment], a complaint

need only allege a chronology of events from which retaliation may be inferred.") [citation

omitted]; *cf. Thomas v. Hill*, 963 F. Supp. 753, 756 (N.D. Ill. 1997) ("Mr. Thomas does not claim

that the defendants' verbal threats and abuse were motivated by retaliation, and the word

'retaliate' does not appear in his complaint.  Nonetheless, the facts alleged would arguably state a

retaliation claim."); *Lashley v. Wakefield*, 367 F. Supp.2d 461, 470, n.6 (W.D.N.Y. 2005) ("Even

though plaintiff uses the word 'retaliatory' and not 'harassment' in the third claim, . . . I construe

his third claim as a . . . claim against Aidala and Piccolo for cruel and unusual punishment by

way of harassment . . . .").[59]  Rather, the governing standard is whether a plaintiff has alleged

---

[58]        *See Trask v. Rios*, 95-CV-2867, 1995 U.S. Dist. LEXIS 18945, at *13 (N.D. Ill.
Dec. 18, 1995) ("'Harass,' 'discriminate,' and 'retaliate' are words to which legal significance
attaches.  Alone, they are legal conclusions that do not place defendants on notice of the
circumstances from which the accusations arise and therefore are inappropriate pleading
devices.") [citations omitted].

[59]        This point of law has also been specifically recognized in the analogous context of
prisoner grievances.  *See Varela v. Demmon*, 05-CV-6079, 2007 U.S. Dist. LEXIS 35873, at *15
(S.D.N.Y. 2007) ("Varela's grievance does not use the word 'retaliation' in describing what
occurred.  But, fairly read [for purposes of the issue of whether Varela exhausted his
administrative remedies regarding his retaliation claim], it does suggest that the assault occurred

facts plausibly suggesting that a defendant subjected him to retaliation for purposes of the First Amendment.  *That* is how the defendant receives fair notice of the plaintiff's claim under Fed. R. Civ. P. 8.

Based on the extra liberal construction that must be afforded to Plaintiff's Fourth Amended Complaint due to his special status as a *pro se* civil rights litigant, I find that the Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Seitz did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 20, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity). Similarly, I find that Plaintiff's Fourth Amended Complaint has alleged facts plausibly suggesting that Defendant Gummerson did not release Plaintiff from the Auburn C.F. S.H.U. on the evening of June 19, 1998 (i.e., he took adverse action against Plaintiff), *because* Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court (i.e., because Plaintiff had engaged in protected activity).

Because Defendants have not challenged Plaintiff's First Amendment retaliation claims

---

in response to Varela's prior complaint to Demmon's supervisors."), *adopted*, 2007 U.S. Dist. LEXIS 47939 (S.D.N.Y. June 14, 2007); *accord*, *Allah v. Greiner*, 03-CV-3789, 2007 U.S. Dist. LEXIS 31700, at *18-19 (S.D.N.Y. Apr. 30, 2007) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance used word "harassment" rather than "retaliation"); *Trenton v. Ariz. Dep't of Corr.*, 04-CV-2548, 2008 U.S. Dist. LEXIS 6990, at *11 (D. Ariz. Jan. 16, 2008) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation"); *Wheeler v. Prince*, 318 F. Supp.2d 767, 772, n.3 (E.D. Ark. 2004) (prisoner's grievance asserted claim of retaliation, for purposes of exhaustion of administrative remedies, even though grievance did not use word "retaliation").  This point of law has also been recognized in other contexts.  *See, e.g.*, *Manzi v. DiCarlo*, 62 F. Supp.2d 780, 794 (E.D.N.Y. 1999) (recognizing that word "discrimination" may be used to articulate a "retaliation" claim for purposes of claim under Americans with Disabilities Act).

against Defendants Seitz and Gummerson on the basis of evidentiary insufficiency in their second motion for summary judgment, I can find no reason why those claims should be dismissed.[60]  As a result, I recommend that Plaintiff's First Amendment retaliation claims against Defendants Seitz and Gummerson survive Defendants' second motion for summary judgment.

Having said all of that, I also find that Plaintiff's Fourth Amended Complaint contains no factual allegations plausibly suggesting that *Defendant Walker* caused Plaintiff to not be released from S.H.U. because Plaintiff had filed, and won, his Article 78 proceeding in Cayuga County Supreme Court.  Rather, Plaintiff's sole theory of liability against Defendant Walker (who was the superintendent of Auburn C.F.) appears to be that Walker somehow caused, in a conspiratorial manner, Defendants Gummerson and/or Seitz to not release Plaintiff because of the decision issued by the Cayuga County Supreme Court.  However, Plaintiff's Fourth Amended Complaint is woefully vague and speculative with regard to the details supporting such a theory of liability.  Viewed from another perspective, Plaintiff's Fourth Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Walker (a supervisor) in the constitutional violation alleged.  As a result, I recommend that Plaintiff's First Amendment retaliation claim against Defendant Walker be *sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(ii), 1915A.

---

[60]      To the extent that Plaintiff's allegation that Defendant Gummerson refused to release him from S.H.U. on the evening of June 19, 1998, falls outside the applicable three-year limitations period, I find that Plaintiff may, and should, benefit from the continuing violation doctrine with regard to that specific allegation, because (1) the event in question was *sufficiently connected* to Plaintiff's continued incarceration in S.H.U. on June 20, June 21 and part of June 22 (which occurred within the applicable limitations period), and (2) Defendant Gummerson's refusal to release Plaintiff, and Plaintiff's continued confinement in S.H.U., was *express*, *openly espoused*, and *discriminatory* (relative to other prisoners who had not filed Article 78 petitions regarding their confinement to S.H.U.).

I hasten to add that, in reaching these conclusions, I in no way rely on any allegations made by Plaintiff for the first time in his opposition papers (as Plaintiff urges the Court to do, out of an extension of special solicitude to him).[61]  That is because it is too late in this proceeding for Plaintiff to constructively amend his pleading in such a way.  It should be noted that Plaintiff has already amended his pleading *four* times.

One final point bears mentioning: I imagine that Defendants may try to prove at trial (or perhaps during a *third* motion for summary judgment, should they be given an opportunity to file such a motion) that Defendants Gummerson and Seitz would have taken the same actions on June 19 and 20, 1998, regardless of whether or not Plaintiff had filed, and won, his Article 78 petition.  I say this because, as I mentioned earlier, it appears from the record that corrections officials at Auburn C.F. *may have* kept Plaintiff in S.H.U. between June 19, 1998, and June 22, 1998, merely so that they could transfer him to another correctional facility rather than return him to Auburn C.F.'s general population (where he would have access to the three inmates who had essentially accused him of making threats against them).[62]  In other words, it appears from the record that the motivation of Defendants Gummerson and/or Seitz *may have* been merely to keep

---

[61]     (*See* Dkt. No. 85, Part 3, at 10-11 [Plf.'s Memo. of Law].)

[62]     (Dkt. No. 85, Part 4, at 20 [Ex. C to Plf.'s Decl., attaching Plaintiff's Inmate Transfer History, indicating that an unsuccessful request to transfer Plaintiff from Auburn C.F. was made on June 22, 1998]; Dkt. No. 85, Part 4, at 44 [Ex. I to Plf.'s Decl., attaching Plf.'s letter of June 22, 1998, to N.Y.S. Attorney General's Office stating that "Capt. Gummerson . . . retorted [to Plaintiff on June 19, 1998] that the Cayuga Supreme Court Judge does not run Auburn's prison and that I was going to remain in SHU until a transfer [to another prison] can be effectuated, because I was not setting foot into the inmate general population again."], *accord*, Dkt. No. 16, ¶ 6[14] [Plf.'s Verified Fourth Am. Compl., asserting same fact]; *see also* Dkt. No. 85, Part 4, ¶ 20 [Plf.'s Decl., stating that, on June 22, 1998, Auburn C.F.'s administration submitted a request that Plaintiff be transferred, which was subsequently denied], *accord*, Dkt. No. 16, ¶¶ 6[16], 6[19] [Plf.'s Verified Fourth Am. Compl., asserting same fact].)

Plaintiff from the three inmates in question, rather than to retaliate against Plaintiff for litigating the legality of his placement in administrative segregation.  However, while some evidence exists in the record supporting such a finding, other evidence exists to the contrary.[63]  Even if such contrary record evidence did not exist, I would find it inappropriate to recommend dismissal of Plaintiff's retaliation claim against Defendants Gummerson and/or Seitz on such a ground.  This is because Defendants did not base their motion on this ground.[64]  As a result, Plaintiff was not notified of this argument and provided an opportunity to adduce evidence in opposition to it.  As stated earlier, on a motion for summary judgment, before the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.  This initial burden, while modest, is not without substance.

---

[63]      (Dkt. No. 16, ¶¶ 6[11]-6[15] [Plf.'s Verified Fourth Amended Compl., swearing that Defendant Gummerson stated to Plaintiff on June 19, 2008, that he was not being released from S.H.U. because "the Cayuga Supreme Court does not run Auburn," and that Defendant Seitz stated to Plaintiff on June 20, 2008, that he was not being released from S.H.U. because "Auburn's Administration runs the prison, not [Judge Corning]."] [internal quotation marks omitted].)  As explained earlier in this Report-Recommendation, verified pleadings have the effect of an affidavit during a motion for summary judgment.  *See*, *supra*, Part I, and note 8, of this Report-Recommendation.  Here, Plaintiffs' Fourth Amended Complaint contains a verification pursuant to 28 U.S.C. § 1746.  (Dkt. No. 16, at 23 [Plf.'s Fourth Am. Compl.].)  Furthermore, the statements that Plaintiff asserts Defendants Gummerson and Seitz made to him on the evenings of June 19 and 20, 1998 (which would presumably be offered by Plaintiff to prove the truth of the matters asserted therein) would not be hearsay because they would each be an admission of a party opponent.  *See* Fed. R. Evid. 801(d)(2).  Even if both statements were hearsay, they would arguably be admissible under the hearsay exception for a statement of the declarant's then-existing state of mind.  *See* Fed. R. Evid. 803(3).

[64]      (*See generally* Dkt. No. 81, Part 5, at 5-8 [Defs.' Memo. of Law]; Dkt. No. 88, Part 1, at 1-5 [Defs.' Reply Memo. of Law, challenging only the pleading insufficiency of Plaintiff's "conclusory" and "last-minute" retaliation claim].)

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' second motion for summary judgment (Dkt. No. 81) be **GRANTED** in part and **DENIED** in part, in the following respects:

(1) Plaintiff's Fourth Cause of Action be **DISMISSED** in its entirety based on the three-year statute of limitations governing that claim or, in the alternative, based on the lack of record evidence establishing a violation of any right to procedural due process under the Fourteenth Amendment;

(2) Plaintiff's Fifth Cause of Action be **DISMISSED** to the extent that it asserts (a) any Fourteenth Amendment procedural due process claim whatsoever, (b) a First Amendment access-to-courts claim against Defendant Walker, and (c) a First Amendment retaliation claim against Defendant Walker; and

(3) Defendants' second motion for summary judgment be **otherwise** **DENIED** so that, surviving that motion is (a) Plaintiff's First Amendment access-to-courts claim against Defendants Seitz and Gummerson, asserted in the Fourth Amended Complaint's Fifth Cause of Action, and (b) Plaintiff's First Amendment retaliation claim against Defendants Seitz and Gummerson, also asserted in the Fifth Cause of Action.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation**. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed. R. Civ. P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was**

not, presented to the Magistrate Judge in the first instance.[65]

BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of H.H.S.*, 892 F.2d 15 [2d Cir. 1989]).

Dated: June 30, 2008
     Syracuse, New York

*[signature]*

George H. Lowe
United States Magistrate Judge

---

[65]    *See, e.g., Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n.3 (2d Cir. 1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n.8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.*, 200 F.3d 895, 902, n.1 (6th Cir. 2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley*, 28 F.3d 532, 535 (5th Cir. 1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] . . . Respondent has waived procedural default . . . objection[].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.*, 863 F.2d 633, 638-39 (9th Cir. 1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty*, 977 F.2d 1347 (9th Cir. 1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].